239 F.3d 1037 (9th Cir. 2001)
 CARLOS CASTRO-CORTEZ, PETITIONER,
v.
IMMIGRATION AND NATURALIZATION SERVICE, RESPONDENT.
JOSE LUIS ARAUJO, PETITIONER,
v.
IMMIGRATION AND NATURALIZATION SERVICE, RESPONDENT.
FRANCISCO MARIO FUNES-QUEVADO, A.K.A. FRANCISCO MARIO FUNES, PETITIONER,
v.
JANET RENO, ATTORNEY GENERAL, RESPONDENT.
RAMON RUEDA, PETITIONER,
v.
RICHARD C. SMITH, DISTRICT DIRECTOR AND JANET RENO, ATTORNEY GENERAL, RESPONDENTS.
NESTOR SALINAS-SANDOVAL, PETITIONER,
v.
JANET RENO, ATTORNEY GENERAL, RICHARD EUGENE SMITH, AND IMMIGRATION AND NATURALIZATION SERVICE, RESPONDENTS.
 Nos. 99-35314, 99-35511, 99-35786, 99-70267, 99-70357, 99-70474
 U.S. Court of Appeals, Ninth Circuit
 Argued and Submitted July 14, 2000
January 23, 2001
 
 [Copyrighted Material Omitted]
 Marc Van Der Hout, and Trina Realmuto, San Francisco, California, for petitioners Carlos Castro-Cortez; Jose Luis Araujo; and Mario Funes-Quevado.
 Camille K. Cook, San Francisco, California, for petitioner Carlos Castro-Cortez.
 Lisa Ellen Seifert, Olympia, Washington, for petitioner Ramon Rueda.
 Matt Adams, Northwest Immigrant Rights Project, Granger, Washington, for petitioner Nestor Salinas-Sandoval.
 Marc Van Der Hout and Trina Realmuto, The American Immigration Lawyers Association and the National Immigration Project of the National Lawyers Guild, San Francisco, California, amici curaie for petitioner Nestor Salinas-Sandoval.
 Timothy P. McIlmail, Civil Division, United States Department of Justice, Washington, D.C., for the respondents.
 Appeals from the United States District Court for the Western District of Washington Thomas S. Zilly, District Judge, Presiding INS No. Afm-qap-ezq; INS No. Abv-lmu-kcd; INS No. Awx-pnd-ioo; D.C. No. CV-98-00803-TSZ; D.C. No. CV-98-01371-TSZ
 Before: William C. Canby, Jr., Stephen Reinhardt, and Ferdinand F. Fernandez, Circuit Judges.
 
 Reinhardt, Circuit Judge
 
 1
 The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) Pub. L. No. 104-208, 110 Stat. 3009-546 (1996) breathed new life into a dormant provision of the Immigration and Nationality Act (INA) that permitted the INS to reinstate prior orders of removal against aliens who reentered the United States.[1] The revised provision, codified at INA 241(a)(5), 8 U.S.C. 1231(a)(5), not only expands the types of orders subject to reinstatement, but constrains the relief available to aliens whose orders are reinstated. When implementing the revised provision, the government decided to change the practice set forth in its prior regulations which provided aliens subject to orders of reinstatement with hearings before an Immigration Judge (IJ). Instead, the INS instituted a new procedure whereby it reinstated such orders and removed such aliens without affording hearings of any sort.
 
 
 2
 In this case, we are asked to decide whether the government' new reinstatement procedure violates the Due Process Clause of the Fifth Amendment. We are also asked to decide whether the new procedure actually applies to the aliens in this case, because all five petitioners reentered the United States before IIRIRA became effective. While we seriously doubt that the government's new reinstatement procedure comports with the Due Process Clause, we need not decide that question here; instead, we hold that INA 241(a)(5) does not apply to aliens who reentered the United States before IIRIRA's effective date.
 
 I. FACTUAL BACKGROUND
 
 3
 This opinion consolidates five cases in which the government, pursuant to INA 241(a)(5), reinstated old orders of deportation or exclusion. In two of those cases, the government has executed the reinstatement, and the aliens appeal from abroad. In the other cases, the government or the district court stayed the execution of the reinstated order. Below we explain the facts surrounding each of the reinstatements.[2]
 
 A. Carlos Castro-Cortez
 
 4
 Carlos Castro-Cortez (hereinafter Castro) is a 42-year-old native of Mexico who has resided in the United States nearly continuously since 1975. In 1982, he married a United States citizen, and together they have two children. On February 9, 1976, Castro received an Order to Show Cause charging him with deportability for having entered the United States without inspection. The events that followed are in dispute. According to Castro, he asked to see a judge but was told by INS officials that the judge was sick. INS officials then told him that if he signed a paper, he could voluntarily depart the United States. On February 12, Castro departed the United States without having seen a judge or having been advised that he was required to remain outside the United States for a particular length of time. He reentered the United States about two months later.
 
 
 5
 The INS contends that Castro was validly deported. It has produced a document stamped "deport to Mexico " with an illegible signature beneath it. However, there is no written record of a deportation hearing or any evidence that Castro ever appeared before an IJ.[3] Regulations in place at the time required that, even if an alien conceded deportability, the IJ was directed to "enter a summary decision on Form I-38, if deportation is ordered, or on Form I-39, if voluntary departure is granted with an alternate order of deportation. " 8 C.F.R. 242.18(b) (1984). The INS has failed to produce any of the documents that, in 1976, IJs were required to execute to order an alien deported or to grant an alien voluntary departure.
 
 
 6
 Following his almost immediate re-entry, Castro made several attempts to legalize his status. In 1987, he applied for a visa under the "Special Agricultural Workers Program" (SAW). In a sworn declaration, he states that he left the United States in 1995 to visit a sick relative in Mexico, and that he returned to the United States via direct flight to San Francisco where, on approximately November 29, he was admitted by an INS inspector who examined his employment authorization card. Castro last entered the United States under a SAW applicant authorization.
 
 
 7
 When Castro learned in 1996 that his legalization petition had been denied, his wife filed an immediate relative visa petition, and it was approved on May 15, 1997. On that day, Castro then filed an application for adjustment of status under INA 245(a), 8 U.S.C. 1255(a).
 
 
 8
 On March 11, 1998, Castro and his counsel appeared at the INS office for a routine adjustment interview. The INS thereupon arrested Castro and informed him that his 1976 deportation was being reinstated. The INS interviewed Castro, and he explained that his most recent entry had been with permission at the San Francisco airport. When asked whether he had ever been deported, he responded that he did not remember exactly, and said "I do not remember talking to a judge." The next day, Castro was served with a Notice of Intent/Decision to Reinstate Prior Order. The INS informed his counsel that it intended to remove him to Mexico that same day, and his counsel intervened and thereafter obtained a stay of removal from this court.
 
 B. Jose Luis Araujo
 
 9
 Jose Luis Araujo is a citizen of Mexico who has resided in the United States since approximately 1979. In 1996, Araujo married a United States citizen, and he has a United States citizen son from a prior marriage. According to Araujo's affidavit, on the morning of March 2, 1999, he was awakened by INS officers who had arrived at his Fremont, California home to apprehend him. He was handcuffed, placed in a car, and delivered to the San Francisco offices of the INS. There he confirmed that he was Jose Luis Araujo, whereupon he was told that he was "going straight to Mexico." He was not permitted to contact his wife or his attorney. He remained in custody until that evening, when he was driven to the airport and flown to Phoenix, Arizona. When he arrived there, he was placed on a bus and driven to Nogales, Mexico, where he was deposited at 6:00 A.M. on March 3, with neither money nor identification. He remains in Mexico awaiting disposition of this petition.
 
 
 10
 The prior order of deportation that the INS reinstated was issued in 1983, when Araujo was deported after entering the United States without inspection. Araujo reentered the United States shortly after his deportation. Over the years, he has attempted on several occasions to legalize his status. He was approved for relative immigrant visas in 1980 and 1981. In 1996, Araujo's wife filed an immediate relative visa petition and Araujo applied for adjustment of status, paying the penalty fee assessed against aliens who entered without inspection. At the time of Araujo's arrest and expulsion in March 1999, the INS had not adjudicated his adjustment application.[4]
 
 
 11
 Araujo petitions this court to review the INS's decision reinstating his 1983 deportation. Because the government no longer permits aliens subject to reinstatement to appear before an IJ or appeal to the Board of Immigration Appeals (BIA), this forum is the first one in which Araujo has sought to challenge the deportation.
 
 C. Francisco Mario Funes-Quevado
 
 12
 Francisco Funes-Quevado (hereinafter Funes) is a native of El Salvador who entered the United States in 1982. He has been married to a United States citizen for nine years, and has two children. On February 18, 1986, the INS ordered Funes excluded from the United States. He was excluded, returned within a month, and has resided in this country since then.
 
 
 13
 In 1991, the INS granted Funes Temporary Protected Status, which was valid through 1994. The next year, Funes applied for adjustment of status. Four years later, in 1999, while the application was still pending, Funes went to the INS office for a routine adjustment of status interview. According to Funes, instead of interviewing him, the INS handcuffed and detained him, and released him after he requested to speak with his attorney. At that time, he was told the INS would schedule a hearing for him before an IJ. The next day, the INS arrested Funes at his place of employment and served him with a Notice of Intent/Decision to Reinstate Prior Order. The form contains a place for the alien to indicate whether he wants to make a statement. Funes said that he did wish to make a statement, and then asked to speak with his attorney. Around midnight that night, without providing him with access to counsel, the INS deported Funes to El Salvador. Like Araujo, Funes appeals to this court from abroad, bringing his first challenge to the reinstatement of his deportation.
 
 D. Ramon Rueda
 
 14
 Ramon Rueda is a citizen of Mexico who initially entered the United States without inspection in 1990. He remained in the United States through 1996, when he traveled to Mexico for a short visit with family. When he attempted to come home to the United States without inspection, he was apprehended, and on April 3, 1996, ordered excluded, at which time he was returned to Mexico.
 
 
 15
 Rueda reentered the United States a few days later. On October 25, 1997, Rueda married a United States citizen, and she subsequently filed an application on his behalf pursuant to INA 245(i) for permanent residence. Notwithstanding Rueda's illegal re-entry, the INS accepted Rueda's application, along with $1,280 in filing fees. On June 4, 1998, the Ruedas went to the INS office for an interview concerning their application. Instead of discussing the application, the government arrested Rueda and served him with a Notice of Intent/ Decision to Reinstate Prior Order. On the form, Rueda indicated that he wished to make a statement. The form indicates that on the same day an INS officer determined that Rueda was subject to reinstatement and signed a pre-printed statement on the bottom of the form certifying that he had reviewed "any statements made or submitted in rebuttal." There is no indication in the record of what statement Rueda made, or whether he was actually afforded an opportunity to make a statement.
 
 
 16
 The INS has not executed the reinstated exclusion order. While in INS custody, Rueda filed a petition for habeas corpus with the district court.[5] It rejected Rueda's habeas petition, and this appeal followed.
 
 E. Nestor Salinas-Sandoval
 
 17
 Nestor Salinas-Sandoval (hereinafter Salinas) is a native of Mexico who came to the United States around 1987. He was deported to Mexico in December 1990, and reentered the United States without inspection in April 1991. On August 15, 1996, he married a United States citizen, and together with his wife, they are raising a daughter from her previous marriage.
 
 
 18
 On February 7, 1997, before IIRIRA's effective date but after its enactment, Salinas and his wife filed for adjustment of status pursuant to INA 245(i) and paid filing fees totaling $1,250. The INS accepted this application and the fees notwithstanding the fact that Salinas had reentered the United States without authorization. More than a year after filing the application, Salinas went to the INS office to inquire about its status. The INS then detained him and presented him with a Notice of Intent/Decision to Reinstate Prior Order.
 
 
 19
 As explained above, the notice has a box where the alien indicates whether or not he wants to make a statement, and then signs his name. No choice concerning making a statement was made on Salinas's form and the signature line reads "does not wish to sign." While Salinas was in custody, his counsel contacted the INS District Director, who agreed to have Salinas placed on supervised release instead of being immediately deported.
 
 
 20
 When the INS notified Salinas that it intended to deport him in two weeks, he filed a petition in the district court seeking habeas corpus relief. The district court granted Salinas's petition for habeas corpus and ordered the INS to consider his application for adjustment of status without regard to 241(a)(5). Salinas timely appealed that order because the district court did not provide all the relief he sought. The government cross-appealed, arguing that 241(a)(5) bars all discretionary relief, including relief under 245(i).
 
 II. JURISDICTION
 
 21
 As explained above, these cases reach this court in two ways: on direct review from the INS, and on appeal from the district court's habeas corpus rulings. We consider our jurisdiction to entertain each type of appeal in turn.
 
 A. Direct review
 
 22
 IIRIRA significantly revised the Immigration and Nationality Act's procedures for judicial review. See INA 242, 8 U.S.C. 1252. INA 242(a)(1) generally authorizes the courts of appeals to review orders of removal. The government concedes that 242 authorizes review of reinstatement orders, and we agree. Because 242 authorizes judicial review of final orders of removal and nothing in that section suggests that the scope of review should be limited in cases such as these, we conclude that we have jurisdiction to review directly petitioners' claims that the reinstatement orders violate their constitutional rights and are not authorized by the INA.
 
 
 23
 Reinstatement orders are not literally orders of removal because the orders merely reinstate previously issued removal (or, in these cases, deportation and exclusion) orders. However, on the basis of this court's precedent applying the precursor to 242, we conclude that 242(a)(1), which authorizes review of "order[s] of removal, " authorizes review of reinstatement orders. Section 242 replaced the INA's previous judicial review procedures, which were codified at INA 106, 8 U.S.C. 1105a (repealed 1996). Like 242, the former procedures authorized us to review "orders of deportation. " 106(a). In the new procedures, Congress substituted the word "removal" for "deportation," and made other changes not relevant here. One aspect of the authorization of judicial review that did not change is that both under the old law and under the new law, review is limited to what are now known as orders of "removal," and were then referred to as orders of "deportation."
 
 
 24
 Under the former judicial review procedures, courts of appeals reviewed final orders under 106(a) that, while not literally orders of deportation, gave effect to such orders. Among the orders reviewed were orders of reinstatement issued under the predecessor provision to 241(a)(5).[6] See Palma v. INS, 318 F.2d 645, 649 & n.3 (6th Cir. 1963). Similarly, we construed 106(a) as authorizing this court to review denials of motions to reopen cases in which aliens are ordered deported, even though the order denying the motion to reopen is not literally an order of deportation. See, e.g. Ontiveros-Lopez v. INS, 213 F.3d 1121, 1124 (9th Cir. 2000). Orders denying motions to reopen, like reinstatement orders, give effect to previously issued deportation orders. We conclude that 242, like former 106, authorizes review of 241(a)(5) reinstatement orders.
 
 
 25
 The parties question whether direct judicial review is authorized because in United States v. Martinez-Vitela, 193 F.3d 1047, 1052 (9th Cir. 1999), withdrawn, 213 F.3d 1205 (9th Cir. 2000), we asserted without support that an order reinstating a prior removal, pursuant to 241(a)(5), is not subject to judicial review. Section 241(a)(5) contains a limitation on judicial review -- it provides that "the prior order of removal... is not subject to being reopened or reviewed." (emphasis added). However, by its terms, this bar applies not to the reinstatement order, but to the prior removal order which is being reinstated. The INA simply does not provide support for the contention in our withdrawn opinion that reinstatement orders are not subject to judicial review pursuant to 242.[7]
 
 
 26
 Finally, the government contends that we lack jurisdiction over some of these petitions because the petitioners failed to exhaust administrative remedies prior to contesting the reinstatements in court. Final orders are not subject to review unless the alien has exhausted administrative remedies. See INA 242(d)(1). When the government decides to reinstate an alien's removal under 241(a)(5), it presents the alien with a form entitled "Notice of Intent/Decision to Reinstate Prior Order." The form contains a statement to be signed by an INS official stating that "the existence of a right to make a written or oral statement contesting this determination[was] communicated to the alien." The form has a line for the alien to sign next to the following statement: "I do do not wish to make a statement contesting this determination." In some of the cases now before us, the aliens either indicated that they did not wish to make a statement or did not check either box. As to such aliens, the government argues that they have failed to exhaust available administrative remedies.
 
 
 27
 This argument is without merit for two reasons. First, the limited opportunity for the alien "to make a statement contesting this determination" simply does not qualify as an administrative remedy. Salinas, for example, chose not to make a statement but still sought administrative relief. He asked his lawyer to contest the determination and, at the same time, declined to plead his own case verbally, having had absolutely no advance notice, no opportunity to review or produce documents, and no opportunity to consult with, much less be represented by, counsel. The proffered opportunity to make a statement does not, under any standard, qualify as an administrative remedy, and therefore "failure to exhaust " that opportunity does not affect the right to appeal.
 
 
 28
 Second, even if the opportunity provided did constitute an administrative remedy, it would not be a remedy that must be exhausted before an appeal could be taken to this court. As noted above, the INA requires that the "alien has exhausted all administrative remedies available to the alien as of right." INA 242(d)(1). The INS regulations governing the process described above are in a section of the regulations titled "Notice," and do not require reconsideration of the final determination even if the alien chooses to make a statement. 8 C.F.R. 241.8(b). In fact, the regulations specifically deny the alien any right to a hearing before an IJ. 8 C.F.R. 241.8(a). The aliens in these cases were merely provided with the opportunity to make a statement to the decision-maker who had already "determined" that the alien was subject to removal. 8 C.F.R. 241.8(b). The only action to be taken by the officer who receives the statement is to "consider whether the alien's statement warrants reconsideration of the determination." Id.
 
 
 29
 In this regard, the alien's ability to make a statement is similar to an alien's ability to file a motion to reopen a BIA decision. See 8 C.F.R. 3.2. When the BIA receives such a motion, it need only consider whether to reopen its prior order, but it is not required to do so. Castillo-Villagra v. INS, 972 F.2d 1017, 1023-24 (9th Cir. 1992).[8] In that case, we held that because the BIA need not actually reopen its prior decision, a motion to reopen is considered a request for discretionary relief, and does not constitute a remedy that must be exhausted. Id.
 
 
 30
 Like the motion to reopen in Castillo-Villagra, the opportunity to make a statement is not an "administrative remed[y] available to the alien as of right," because the government is not required to reconsider its prior decision. Rather, the officer need only consider whether to reconsider a final determination. Because the relief is discretionary, it is not a remedy as of right that must be exhausted before judicial review is authorized. See 242(d)(1).
 
 B. Habeas Corpus
 
 31
 Rather than appealing directly to this court, petitioners Rueda and Salinas filed habeas corpus petitions in the district court to challenge the reinstatement orders. The government contends that INA 242(b)(9) divests the district court of jurisdiction to hear petitioners' habeas corpus petitions, and establishes the exclusive procedures for challenging removal orders.[9] The district court rejected that argument, and considered the petitions on the merits. In doing so, it erroneously posited that the INA precludes direct judicial review of reinstatement orders. The error was not surprising, given that we had so held in an opinion that we subsequently withdrew. See Martinez-Vitela, 193 F.3d at 1052. Citing our precedent that "the district court retains [habeas corpus ] jurisdiction under 28 U.S.C. 2241 when the petitioner has no other judicial remedy," Magana-Pizano v. INS, 152 F.3d 1213, 1216 (9th Cir.), amended, 159 F.3d 1217 (9th Cir. 1998), vacated, 526 U.S. 1001 (1999), the district judge then concluded that he retained jurisdiction to hear petitioners' habeas claims because no judicial review was otherwise available.
 
 
 32
 In cases such as these, where the claims could have been brought in this court in the first instance, Congress has provided a jurisdiction-saving tool that permits us to transfer the cases to this court and consider the petitions as though they had never been filed in the district court. See 28 U.S.C. 1631; Clark v. Busey, 959 F.2d 808, 812 (9th Cir. 1991) (transfer statute corrects lack of jurisdiction when cases are "actually transferred" or "transferable"). The transfer statute authorizes us to transfer these cases to ourselves if: (1) we would have been able to exercise jurisdiction on the date that they were filed in the district court; (2) the district court lacked jurisdiction over the cases; and (3) the transfer is in the interests of justice. Kolek v. Engen, 869 F.2d 1281, 1284 (9th Cir. 1988). As we explain below, all three conditions are met.
 
 
 33
 1. Jurisdiction to Hear Petitions Had They Been Filed in This Court
 
 
 34
 As explained in Part A above, this court has jurisdiction to hear appeals of final orders reinstating prior removal orders. Therefore, Rueda and Salinas could have brought their appeals directly to this court. INA 242(b)(1) provides that appeals must be brought within thirty days. Rueda filed his habeas corpus petition less than a week after the government reinstated his exclusion order, and therefore at a time when we would have been able to exercise jurisdiction had his appeal been filed in this court. Salinas filed his habeas corpus petition on September 30, 1998, less than 30 days after the INS issued its final notice on September 15, 1998 that it intended to deport him.[10] Accordingly, as with Rueda's petition, we would have had jurisdiction over Salinas's petition had it been filed in this court.
 
 
 35
 2. District Court Lacked Jurisdiction.
 
 
 36
 The second criterion that must be satisfied before the transfer statute is invoked is that the district court must have lacked jurisdiction to entertain the habeas corpus petition. As explained above, the district court based its conclusion that it had jurisdiction to consider the petition on the erroneous, if understandable, assumption that this court lacked jurisdiction to consider the matter on direct appeal.
 
 
 37
 District courts are authorized by 28 U.S.C. 2241 to consider petitions for habeas corpus. That section does not specifically require petitioners to exhaust direct appeals before filing petitions for habeas corpus.[11] However, we require, as a prudential matter, that habeas petitioners exhaust available judicial and administrative remedies before seeking relief under 2241. United States v. Pirro, 104 F.3d 297, 299 (9th Cir. 1997); Brown v. Rison, 895 F.2d 533, 535 (9th Cir. 1990).
 
 
 38
 In Brown, we explained that the exhaustion requirement in 2241 cases is subject to waiver because it is not a "jurisdictional " prerequisite. Brown, 895 F.2d at 535. Our conclusion that it is not "jurisdictional" is based on the fact that exhaustion is not required by statute. See id. Of course, the transfer statute requires that the transferor court have a "want of jurisdiction. " 28 U.S.C. 1631. While the 2241 exhaustion requirement may be characterized as "not jurisdictional" because it is a prudential -- rather than a statutory -- limit on jurisdiction, we nonetheless conclude that it suffices to comply with the want of jurisdiction requirement in the transfer statute.
 
 
 39
 The purpose of the transfer statute is to eliminate" `the risk of filing in the wrong court.' " Rodriguez-Roman v. INS, 98 F.3d 416, 424 (9th Cir. 1996) (quoting Dornbusch v. Commissioner of Internal Revenue Svc., 860 F.2d 611, 614 (5th Cir.1988) (per curiam)); see In Re McCauley, 814 F.2d 1350, 1351-52 (9th Cir. 1987). In Rodriguez-Roman, we transferred a case to this court in which venue was lacking in the court in which it was filed, although inappropriate venue is not actually want of jurisdiction. Rodriguez-Roman, 98 F.3d at 424. We did so in light of clear congressional intent that " `a case mistakenly filed in the wrong court [should ] be transferred as though it had been filed in the transferee court on the date in [sic] which it was filed in the transferor court.' " Alexander v. Commissioner of Internal Revenue, 825 F.2d 499, 501 (D.C. Cir. 1987) (quoting 128 Cong. Rec. 3572 (1982)).
 
 
 40
 Prudential limits, like jurisdictional limits and limits on venue, are ordinarily not optional. The district court was not authorized to hear these petitions under 2241, because direct review was available. Accordingly, we conclude that the transfer statute is an appropriate mechanism to cure the filing defect by taking jurisdiction and directly reviewing these cases because the district court, based on prudential constraints, could not entertain them.
 
 3. Transfer Is in the Interests of Justice
 
 41
 When a petitioner files in the wrong court based on a good faith error about the appropriate forum for his claim, it is in the interests of justice to transfer the case to cure the want of jurisdiction. Rodriguez-Roman, 98 F.3d at 424. In this case, petitioners had good reason to believe that direct review was not available and that a habeas corpus petition was their only avenue to secure judicial review. This court reached the same conclusion in Martinez-Vitela, and the government had taken the position that direct review was not available.
 
 
 42
 Under the circumstances, it is in the interests of justice to exercise our authority under the transfer statute. Because the conditions of the transfer statute are satisfied, we deem these appeals transferred to this court and proceed to the merits.
 
 III. DUE PROCESS
 
 43
 Petitioners contend that INA 241(a)(5) violates their right to procedural due process by summarily expelling them from the country solely on the basis of the evaluation of an INS agent, with no opportunity for a hearing before an Immigration Judge (IJ). The government's procedures, the petitioners contend, are deficient because they deny them: a hearing before an IJ; a right to appeal to the BIA; a right to develop a record; representation by counsel; and adequate notice of the government's intended action. The reinstatement process raises very serious due process concerns, and is caused not by a change mandated by Congress as part of IIRIRA, but by an administrative decision to amend the regulations governing reinstatement proceedings in the wake of IIRIRA.
 
 
 44
 The new reinstatement of removal provision, INA 241(a)(5), provides in full that:
 
 
 45
 If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this Act, and the alien shall be removed under the prior order at any time after the re-entry.
 
 
 46
 This provision makes no mention whatsoever of the procedures to be used to implement it. As noted above,S 241(a)(5) modified and replaced a provision of the INA providing for reinstatement of orders of deportation. See INA 242(f) (repealed 1996).[12] The new provision substantively differs from its predecessor in that: it applies not just to certain deportations, but to all orders of removal; it prohibits review of the underlying removal order; it deems the alien ineligible for other relief; and it eliminates language in the prior provision making it applicable to cases pending before enactment of the reinstatement provision. In one important respect, the reinstatement provision was not modified -- in neither version did Congress specify the procedures to be used to effectuate the reinstatements.[13]
 
 
 47
 The regulation implementing the former reinstatement provision specifically afforded the alien the right to appear before an IJ to contest the reinstatement. 8 C.F.R. 242.23 (repealed 1997). It charged the IJ with determining: the identity of the alien; whether the alien was previously deported under a provision of the act subjecting him to reinstatement; and whether the alien illegally reentered the United States. C.F.R. 242.23(c). Under the new reinstatement statute, the government must still determine the alien's identity, the terms on which the alien left this country, and whether the alien illegally reentered. Nevertheless, the revised regulations implementing the new provision eliminate the basic procedural safeguards of C.F.R. 242.23, and replace them with a summary process in which an Immigration Officer alone makes the relevant determinations. 8 C.F.R. 241.8 (1999).
 
 
 48
 As to petitioners' due process claim, there is no dispute that aliens subject to orders of reinstatement enjoy Fifth Amendment protection. In Yamataya v. Fisher, 189 U.S. 86 (1903), the Supreme Court rejected the due process claim of a Japanese woman challenging an order of deportation, but made clear that the Due Process Clause governs the behavior of administrative officials charged with implementing the immigration laws:
 
 
 49
 [T]his court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in "due process of law " as understood at the time of the adoption of the Constitution.
 
 
 50
 Yamataya, 189 U.S. at 100. The Court has thus far never wavered from the core principle that "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) (emphasis added);[14] see also Getachew v. INS, 25 F.3d 841, 845 (9th Cir. 1994).
 
 
 51
 The Due Process Clause requires that aliens "threatened with deportation" are provided the right to "a full and fair hearing." Getachew, 25 F.3d at 845. A neutral judge is one of the most basic due process protections. Marincas v. Lewis, 92 F.3d 195, 204 (3d Cir. 1996). Nevertheless, the government fails to utilize its stable of neutral IJs to consider whether to issue reinstatement orders, and instead leaves that decision to INS Immigration Officers. Marincas holds that the use of Asylum Officers rather than IJs to adjudicate asylum applications made by stowaways deprives the applicants of due process. Id. In light of Marincas, we have serious doubt whether the use of Immigration Officers to determine whether to reinstate removal orders comports with due process.
 
 
 52
 Not only are aliens subject to reinstatement denied the opportunity to appear before an impartial decision-maker, but the regulations do not provide them with access to counsel. Thus, according to Castro, when he was apprehended at the INS offices, his lawyer was present; however, Castro was denied access to him when he was presented with the notice of intent to reinstate his deportation, and when he was interviewed. Similarly, according to Funes, he requested access to counsel, but his request was denied. Fundamental to due process is the right to counsel, and we have previously held that, in deportation hearings, aliens have the "right to obtain counsel of their choice at their own expense." Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 554 (9th Cir. 1990). We see no reason why this right does not apply in the case of reinstatement proceedings.
 
 
 53
 Finally, an alien cannot receive a full and fair hearing unless he has the right to place information into the administrative record. Getachew, 25 F.3d at 845. The INS's reinstatement procedures provide the alien with no opportunity to do so. While the alien may "make a statement," he has no right to introduce documents to be considered by the governmental decision-maker. Denial of this right not only jeopardizes the chances for a fair determination initially, but it hampers our review of the INS decision. The INA precludes us from considering facts not in the administrative record, INA 242(b)(4), and it also prohibits us from remanding this matter to the district court for fact-finding. INAS 242(a)(1). Thus, were we required to determine the validity of Castro's contention that he had not actually been deported or his claim that he had not actually illegally reentered, we would be deprived of the benefit of any evidence that Castro wished to introduce. Under the regulations, aliens such as Castro have no opportunity to introduce evidence before the Immigration Officer, and the INA prohibits them from introducing evidence in the federal courts. The contention that this procedure comports with fundamental notions of due process is difficult for us to comprehend.
 
 
 54
 Whether the INS procedures codified at 8 C.F.R.S 241.8 meet the minimum protections required by the Due Process Clause is an important question of first impression. Nevertheless, while we have serious doubts as to the constitutionality of these procedures, we do not decide that question because we may rule in petitioners' favor on a narrower ground. As we conclude below, the new statutory provision does not apply in their cases.
 
 IV. APPLICABILITY OF INA 241(a)(5)
 
 55
 The orders the government reinstated in these cases were not orders of "removal," but "deportation" and "exclusion " orders that pre-date IIRIRA (and its introduction into immigration law of the concept of "removal"). Petitioners contend that they are not subject to INA 241(a)(5) for two reasons. First, they argue that INA 241(a)(5) applies only to orders of removal, not orders of deportation and exclusion. Second, they assert that INA 241(a)(5), which became effective on April 1, 1997, see IIRIRA 309(a), applies only to illegal reentries after that date.
 
 
 56
 As to their first argument, the government notes that while INA 241(a)(5) does not specifically refer to deportation or exclusion orders, the IIRIRA transition rules provide that "any reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation." IIRIRA 309(d)(2). If IIRIRA 309(d)(2) were applied in these cases, the reference to an "order of removal" in INA 241(a)(5) would include the deportation and exclusion orders reinstated against the petitioners, thereby making them subject to INA 241(a)(5). Petitioners argue, however, that IIRIRA 309(d)(2) does not apply to reinstatements initiated, as were theirs, after April 1, 1997, because it is merely a part of IIRIRA's special rules applicable only to those proceedings that were in process at the time the new statute took effect.
 
 
 57
 We need not resolve this issue because we agree with petitioners' second argument -- that whether or not INA 241(a)(5) may be used to reinstate orders of deportation and exclusion, it does not apply retroactively to aliens who reentered the United States before IIRIRA's effective date. Because all five petitioners reentered before that date, the statutory provision is not applicable to them.
 
 
 58
 Two recent Supreme Court opinions explain the procedure we must follow in determining whether a new statute should be retroactively applied to conduct that takes place before its enactment. In Landgraf v. USI Film Products, 511 U.S. 244 (1994), the Supreme Court reaffirmed that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." Id. at 265; see also Hughes Aircraft Co. v. U.S. ex rel. Schumer, 520 U.S. 939, 946 (1997). Because "[e]lementary... fairness" requires that citizens be able to conform their behavior to the law, Landgraf, 511 U.S. at 265, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." Kaiser Aluminum and Chem. Corp. v. Bonjorno, 494 U.S. 827, 855 (1990). Landgraf explains that a court must first determine "whether Congress has expressly prescribed the statute's proper reach." Landgraf, 511 U.S. at 280. If it has not, then a court must determine whether the statute acts retroactively by assessing whether it "takes away or impairs vested rights, " "creates a new obligation," "imposes a new duty," or "attaches a new disability, in respect to transactions or considerations already past." Id. at 269 (internal citation omitted). If so, then absent a plain statement to the contrary, courts should presume that Congress does not intend that the statute be retroactively applied. See id. at 280.
 
 
 59
 Shortly after it decided Landgraf, the Supreme Court decided Lindh v. Murphy, 521 U.S. 320, 323 (1997), which clarified the nature of the first inquiry under Landgraf. Lindh makes explicit that the first step in determining whether the change applies is to determine congressional intent using the "normal rules" of statutory construction. Id. at 326.
 
 
 60
 For three reasons, we conclude that Congress clearly intended that the statute should not be applied retroactively to aliens whose re-entry occurred prior to its enactment. First, as explained above, INA 241(a)(5) replaced INAS 242(f) (repealed 1996), which provided more limited authority to reinstate deportations. The initial reinstatement provision was enacted in 1952, and specified in the INA that it was applicable to reentries "whether before or after June 27, 1952," the provision's effective date. INA, Pub. L. No. 82-414, 66 Stat. 208 (1952). When Congress in 1996 rewrote the provision and codified it at INA 241(a)(5), rather than modifying the retroactivity language to specify the effective date of IIRIRA, or even simply leaving the retroactivity language as it was (and thus in either case providing that the new, expanded reinstatement authority would apply to reentries that occurred before as well as after its effective date) it did the opposite. It eliminated the retroactivity language completely. See IIRIRA 305(a).[15] Congress's decision to remove the retroactivity language from this part of the statute provides strong support for the conclusion that it did not intend that the revised provision be applied to reentries occurring before the date of the statute's enactment.
 
 
 61
 Second, examining the rest of IIRIRA provides further evidence that Congress did not intend that 241(a)(5) apply to reentries that occurred prior to April 1, 1997, IIRIRA's effective date. As explained below, in several other sections of IIRIRA that change immigration rules for conduct that takes place before the statute's effective date, Congress specified that the sections were to apply to such pre-enactment conduct. That Congress specifically indicated that those sections would apply to pre-enactment conduct, and failed to do so in 241(a)(5), supports the view, by negative implication, that 241(a)(5) does not retroactively apply to aliens who reentered the United States before April 1, 1997. See Lindh, 521 U.S. at 326-32.
 
 
 62
 For example, IIRIRA makes several amendments to the INA's definitions, and specifies that those amendments are to apply to conduct taking place before enactment of the amended definitions. IIRIRA amends INA 106, which contains a modified definition of "aggravated felony," to provide that "the term [aggravated felony] applies regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph." See IIRIRA 321 (emphasis added).[16] Similarly, as part of IIRIRA's extensive expansion of grounds for exclusion and amendments to the provisions authorizing waiver of exclusion, Congress specifically stated that conduct that occurred before enactment would subject an alien to exclusion or prohibit a waiver. See, e.g. IIRIRA 347(c) (exclusion because of unlawful voting applies to any alien who has voted "before, on, or after the date of the enactment of this Act") (emphasis added); IIRIRA 351(c) (specifying that amendments to INASS 212(d)(11) and 241(a)(1)(E)(iii) "shall apply to applications for waivers filed before, on, or after the date of the enactment of this Act") (emphasis added). Nevertheless, in INAS 241(a)(5), Congress did not make the reinstatement provision applicable to aliens who reentered the United States before enactment.
 
 
 63
 Finally, in this case congressional silence is instructive. Notwithstanding whether a statute actually has an impermissibly retroactive effect, Congress is deemed to enact legislation with Landgraf's "default rule" in mind. Lindh, 521 U.S. at 327-28. Accordingly, silence provides useful evidence as to intent for the first step of Landgraf's two-part inquiry. The Lindh Court explained that "[s]ince Landgraf was the Court's latest word on the subject when the Act was passed, " Congress was on notice as to the "wisdom of being explicit" if it wanted a provision to be retroactively applied. Id. at 328.[17]
 
 
 64
 Thus, Congress's failure to include language applying 241(a)(5) to illegal reentries that occurred prior to IIRIRA's enactment, combined with its decision to remove the express language authorizing retroactive application that appeared in its predecessor provision, and the fact that Congress expressly made several other provisions of IIRIRA applicable to preenactment behavior, requires the conclusion that Congress intended 241(a)(5) to encompass only post-enactment reentries. See Valderrama-Fonseca v. INS, 116 F.3d 853, 856 (9th Cir. 1997) (holding that Congress knew how to make IIRIRA's provisions explicitly retroactive, and not having done so, "we hesitate to read retroactivity into[it]") (footnote omitted). Because congressional intent is clear, we have no occasion to employ the second part of the Landgraf inquiry.
 
 
 65
 Finally, citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984), the government argues that we should defer to its interpretation concerning the applicability of 241(a)(5) to reentries occurring prior to the statute' effective date.[18] In Matter of G-N-C-, Int. Dec. 3366 (BIA 1998), the BIA applied the reinstatement provision to an alien who reentered the United States in 1995. To the extent that Matter of G-N-C- constitutes an interpretation of the applicability of 241(a)(5) in cases such as these (it contains no discussion of the retroactive application of the statute), it is still not entitled to deference.
 
 
 66
 In Chevron, the Supreme Court explained that an agency's interpretation of a statute must be accorded deference where Congress has left a gap for it to fill or where it makes a reasonable interpretation of a provision that is ambiguous or uncertain. Chevron, 467 U.S. at 843-44; INS v. AguirreAguirre, 526 U.S. 415, 424 (1999). Chevron deference is predicated on the assumption that a statute's ambiguity constitutes an "implicit delegation" to the agency to interpret the statute. Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 120 S. Ct. 1291, 1314 (2000).
 
 
 67
 In this case, it is inconceivable that Congress intended to delegate to the BIA the decision whether to apply INA 241(a)(5) to conduct that pre-dates its enactment. IIRIRA contains extremely detailed transition rules dictating the application of IIRIRA to past, present and future cases. See IIRIRA 309. Because Congress assumed for itself the task of determining when and how IIRIRA's various provisions would become applicable, Chevron deference is not appropriate. See Gorbach v. Reno, 219 F.3d 1087, 1093 (2000) (en banc) (declining to apply Chevron deference because the statute at issue, taken as a whole, "leaves no room to infer an implicit delegation").
 
 
 68
 Furthermore, we conclude that deference would be inappropriate in this case because the proper interpretation of the applicability of 241(a)(5) is clear. Under Chevron, a court must first analyze the law applying normal principles of statutory construction, and then defer to the agency if, after performing that analysis, it concludes that the statute is ambiguous or uncertain. Chevron, 467 U.S. at 843 n.9; INS v. Cardoza-Fonseca, 480 U.S. 421, 446 (1987); LujanArmendariz v. INS, 222 F.3d 728, 749 (9th Cir. 2000). As explained above, traditional tools of statutory construction demonstrate that 241(a)(5) does not apply to reentries that occur before April 1, 1997. Therefore, we have no occasion to apply Chevron's deference rule.
 
 V. CONCLUSION
 
 69
 The INS erred in reinstating petitioners' deportations pursuant to INA 241(a)(5), because that section applies only to aliens who re-enter the United States after IIRIRA's effective date. We therefore grant the petitions and remand to the INS with instructions to vacate its orders reinstating the aliens' prior deportation and exclusion orders.
 
 
 70
 As to petitioners Castro, Araujo, and Funes, the petitions for review are GRANTED and the reinstatement orders are VACATED. Respondents are directed to return Araujo and Funes to the United States. As to petitioners Rueda and Salinas, the matters are transferred to this court to be considered as petitions for review, the petitions are GRANTED, and the reinstatement orders are VACATED. All of the cases are REMANDED for further proceedings not inconsistent with this opinion.[19]
 
 
 71
 TRANSFERRED, PETITIONS GRANTED, ORDERS VACATED, AND REMANDED.
 
 
 
 NOTES:
 
 
 [1]
 The concept of "removal" of aliens was also introduced by IIRIRA, and replaces two related concepts: "exclusion " and "deportation." The former reinstatement provision, INA 242(f), 8 U.S.C. 1252(f) (repealed 1996), only permitted reinstatement of certain deportation orders, and did not apply to exclusion orders. The 242(f) (repealed 1996) authority seems to have fallen into desuetude before its repeal. It has not been considered in a reported court of appeals opinion since 1978, nor has it been discussed in a reported Board of Immigration Appeals opinion since 1966. See United States v. Pereira, 574 F.2d 103, 104 (2d Cir. 1978); Matter of Ibarra-Obando, 12 I. & N. Dec. 576 (BIA 1966).
 
 
 [2]
 As explained in detail in Section III below, these cases reach us with a paltry administrative record because the INS took actions against the petitioners without affording them an opportunity for a hearing. On appeal, some of the petitioners submitted affidavits that are not in the administrative record. Because the aliens were not afforded administrative hearings, they had no opportunity to place the information in the affidavits into the record. We may "decide [these direct appeals] only on the administrative record" on which the INS based its decision. INA 242(b)(4)(A), 8 U.S.C. 1252(b)(4)(A). In this background section, we describe the facts surrounding the aliens' cases, including the facts in the affidavits that are outside the administrative record, for context and informational purposes only. We base our decision solely on the administrative records before us.
 
 
 [3]
 Petitioner's counsel made two written requests pursuant to the Freedom of Information Act to obtain the tapes of any deportation proceedings involving Castro, and received the following response from the INS. "An additional search was made for INS audio tapes relating to the subject. No audio tapes were found."
 
 
 [4]
 Araujo points to evidence in his INS file suggesting that he would have been approved for adjustment of status had the INS not elected to invoke 241(a)(5) against him. The file contains letters addressed to him and his attorney confirming that he had been granted permanent resident status, but those letters were never sent.
 
 
 [5]
 On June 12, 1998, after posting a $10,000 bond, Rueda was released from custody and placed on supervised release pending exclusion.
 
 
 [6]
 The prior provision, which was eliminated by IIRIRA, was codified at INA 242(f), 8 U.S.C. 1252(f) (repealed 1996). IIRIRA replaced the prior INA 242 with the current INA 242, a section concerning judicial review. Confusingly, this opinion must consider both the repealed INA 242(f), governing reinstatement of deportations, and the new INA 242, which concerns judicial review of removal orders.
 
 
 [7]
 The government agrees. In its brief to this court, it states "Respondent disagrees with this Court's interpretation" in Martinez-Vitela that 241(a)(5) precludes judicial review of reinstated orders under 242. In an attempt to reconcile Martinez-Vitela with the principle that some forum must exist to raise constitutional challenges toS 241(a)(5), the government contends that 242(a)(1) must be interpreted to provide that forum, but that the forum is limited to the constitutional minimum. Of course, since Martinez-Vitela has been withdrawn, there is no authority that supports the contention that review under 242 is limited to constitutional challenges. We therefore reject the claim that we have authority to review only petitioners' constitutional challenges.
 
 
 [8]
 Castillo-Villagra applied the pre-IIRIRA exhaustion requirement, 8 U.S.C. 1105a(c) (repealed 1996), that was replaced with INA 242(d)(1). That provision read as follows:"An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." 8 U.S.C.S 1105a(c). The "available as of right" language was not modified by IIRIRA, and therefore our precedent concerning its interpretation applies to INA 242(d)(1) just as it did to its predecessor.
 
 
 [9]
 This position is directly contrary to our holding in Flores-Miramontes v. INS, 212 F.3d 1133, 1139-41 (9th Cir. 2000) that 242(b)(9) does not preclude the availability of habeas corpus relief.
 
 
 [10]
 While the INS initially served Salinas with a notice to reinstate his deportation on June 3, 1998, we conclude, in light of all of the circumstances, that the September 15, 1998 notice was the event that triggered the 30 day time limit for filing an appeal. The district court reached the same conclusion. It explained that on June 3, in response to Salinas's counsel's objection to the reinstatement, the INS District Director "apparently canceled the reinstatement of the... deportation order [issued on that date]."
 
 
 [11]
 In contrast, 28 U.S.C. 2254, which governs habeas corpus petitions filed by petitioners in state custody, specifically requires that petitioners exhaust other avenues of relief. See 2254(b)(1).
 
 
 [12]
 Section 242(f) provided:
 "Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether before or after June 27, 1952, on any ground described in any of the paragraphs enumerated in subsection (e) of this section [covering deportation based on alien smuggling; criminal offenses; failure to register and falsification of documents; and national security grounds], the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such re-entry. For the purposes of subsection (e) of this section the date on which the finding is made that such reinstatement is appropriate shall be deemed the date of the final order of deportation."
 
 
 [13]
 The significance of this omission is heightened by the fact that IIRIRA amended other parts of the statute to expedite removal of aliens from this country. See, e.g. IIRIRA 302(a) (amending INA 235(b)(1)(A) (8 U.S.C. 1225(b)(1)(A)) to authorize an INS officer to remove arriving aliens without providing the aliens a hearing before an IJ). Had Congress intended to change the reinstatement procedures by eliminating the alien's right to appear before an IJ and contest the reinstatement order, it undoubtedly would have done so.
 
 
 [14]
 In contrast, Mezei holds that aliens "on the threshold of initial entry" are only entitled to the process provided by Congress. Mezei, 345 U.S. at 212.
 
 
 [15]
 Congress often leaves specific dates in statutory provisions without updating the date when it revises the statute with the effect that the updated provision applies retroactively from the initial, unchanged date in the statute. See, e.g. 26 U.S.C. 171(b)(1)(B)(ii).
 
 
 [16]
 In another amendment to the definitions in the INA, Congress provided that the amended definitions of "conviction " and "term of imprisonment " "shall apply to convictions and sentences entered before, on, or after the date of enactment of this Act." See IIRIRA 322(c).
 
 
 [17]
 This principle does not apply to statutory changes that are merely procedural. See Lindh, 521 U.S. at 328. As to such changes, Landgraf makes clear that they generally may be applied to pending cases without concern about retroactive effect. See Landgraf, 511 U.S. at 275. The change made by 241(a)(5), like the change at issue in Lindh, is not merely procedural because it affects the availability of relief to aliens by denying them the opportunity to apply for other relief under the act. Lindh, 521 U.S. at 327 (change to habeas corpus rules that alters standards of proof is not merely procedural).
 
 
 [18]
 The authority the government cites for the proposition that the statute applies in these cases is the INS implementing regulation at 8 C.F.R. 241.8 (2000). That regulation authorizes the INS to reinstate orders of exclusion and deportation as well as orders of removal, but it does not specify whether orders can be reinstated against aliens who reentered prior to April 1, 1997. Therefore, 241.8 does not support the contention that the government interprets the statute as applying to such reentries.
 
 
 [19]
 We appreciate our dissenting colleague's thoughtful and entertaining dissent, although we believe that the portion regarding the statute's retroactivity is devoted too much to the rules of construction for ambiguous provisions explicated in Landgraf and too little to the fact that Congress simply decided, as the plain statutory language reflects, not to make the provision in question applicable to re-entries that occurred prior to the date of enactment -- hardly an unusual or surprising choice. What we regret, however, is that our colleague did not follow what appears to have been his inclination to recognize that the INS's regulations violate the Due Process Clause. With his penchant for understatement, our colleague denominates the INS's view of due process as "peculiar " but concludes that it would be inappropriate to pursue that view in a dissent. To the contrary, we believe that pursuing that view would likely result in the dissent's becoming a separate concurrence.
 
 
 FERNANDEZ, Circuit Judge, Dissenting:
 
 72
 These cases involve aliens who came to our country illegally, were discovered, and who were accorded the procedural and due process rights we offer before they were deported. Nothing deterred, and with nothing if not disdain for our laws, they almost immediately reentered illegally.[1] They were not unique, and Congress was very concerned about the problems that they and others caused.
 
 
 73
 An objective observer would have asked, as Congress did, just what was the purpose of all of that procedure, all of those punctilious niceties, which can take years to complete, if the person could just step back into the country a few days later and have the roundeley go on? Society might well have saved its time and concern in the first place; after all, it could not protect itself against the alien's improper presence anyway. In an attempt to correct that problem, Congress took an existing concept and expanded it. In what is now 8 U.S.C. 1231(a)(5), Congress decided to allow what amounts to recognition and execution of the prior judgment. It declared:
 
 
 74
 If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the re-entry.
 
 Id.[2]
 
 75
 We are now told that in enacting the provision, which was clearly designed to deny benefits to aliens who had already been removed,[3] Congress largely failed in its purpose. Aliens, like those at hand, who came back in before the effective date of the provision, are not even affected by it. They may continue to reap the benefits of their wrongdoing; they may demand relief despite the fact that they have already been removed once before, or, in theory, even more than once. Why? Because Congress did not declare that 1231(a)(5) is meant to be retroactive. I cannot agree with that argument.
 
 
 76
 No doubt law is purposive in nature -- that purpose being the good ordering of society -- and that makes truly retroactive legislation seem to be the very antithesis of law.[4] A person cannot conform yesterday's actions to today's ukase. So, we at least assume that legislation is prospective in nature. Judicial decisions are, of course, different -- they, presumably, declare what the law has been and are retrospective. But what is it to say that a law is prospective or retrospective? Clearly enough, if Holmes' bad man[5] decides to do an act today and garners a benefit today, which the existing law permits, there is something wrong about legislating tomorrow that the act was not permitted at all and that the benefit must be taken away. But it is different when that bad man goes on committing those acts in the hope that at a later time he will get a benefit, or a reprieve. What if society enacts legislation to thwart that hope before the bad man reaches his goal? Is that suspect? I think not. In that vein, the Supreme Court has laid out a test to help us decide the retrospectivity issue on a day-to-day basis.
 
 
 77
 Pure theory aside, the test does generally permit legislation with retroactive effect, but we must first ask "whether Congress has expressly prescribed the statute's proper reach." Landgraf v. USI Film Prods., 511 U.S. 244, 280, 114 S. Ct. 1483, 1505, 128 L. Ed. 2d 229 (1994). If so, we need go no further. If not, we must then go on to ask "whether the new statute would have retroactive effect." Id. In so doing, we must ask ourselves "whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Id. If we then decide that it does have retroactive effect, "it does not govern absent clear congressional intent favoring such a result." Id. In all of that, however, we should not lose sight of the fact that the point of this exercise is to avoid sweeping away properly settled expectations, see id. at 266, 114 S. Ct. at 1497, and that in making the analysis we are making "a common sense, functional judgment." Martin v. Hadix, 527 U.S. 343, 357, 119 S. Ct. 1998, 2006, 144 L. Ed. 2d 347 (1999). In my opinion, a proper application of these rules to this statute yields the answer that the statute is not retrospective in fact, but if it is dubbed retrospective, that is precisely what Congress intended it to be.
 
 
 78
 I agree that Congress did not expressly say that the statute is retroactive, although it is plain that it speaks to something that happened in the past. There was a removal. In a vast number of cases that must have occurred before the statute was enacted. At any rate, the point is that the statute will always initially key on an event that at least commenced in the past. That event, of course, was not an act of the alien. It was an act of the government, often including the judicial system, that sent him from this country -- the order of removal.
 
 
 79
 Undoubtedly the statute also considers acts of the alien -his illegal re-entry and illegally remaining here. Even entry, however, is not a simple past act; it is, in fact, an offense which continues far beyond the instant of entry itself. The entry may be a separate act, but its effect continues, and is also embedded in the "found in" crime which, itself, is a continuing crime. United States v. Ruelas-Arreguin, 219 F.3d 1056, 1061-62 (9th Cir. 2000); United States v. PachecoMedina, 212 F.3d 1162, 1165-66 (9th Cir. 2000); United States v. Ramirez-Valencia, 202 F.3d 1106, 1110 (9th Cir. 2000); United States v. Rivera-Ventura, 72 F.3d 277, 282 (2d Cir. 1995).
 
 
 80
 Even laying aside the significant fact that the wrongdoing continues, the prior order itself has a continuing effect. The statutory language of 1231(a)(5) merely underscores the force and effect of that prior order, and treats it as most judgments would be treated; the prevailing party is allowed to seek to execute upon the judgment in its favor. True it is that the judgment has already been executed upon once, but there is nothing unusual about allowing multiple executions on a judgment until the full relief under it has been obtained. The purpose and effect of 1231(a)(5) is simply to assure that the prevailing party continues to prevail, as indeed it should.
 
 
 81
 It is also true that 1231(a)(5) expressly provides that the alien may not deflect his removal by obtaining other relief,[6] but the previous possibility that he might have obtained that relief does not change the chemistry at work here. The mere possibility that he may have obtained discretionary relief from deportation conferred no settled right upon him, and its unavailability does not increase his liability for past actions -- he was always liable to removal. Nor does it impose any new duties -- his duty was always to remain out of this country once he was sent out of it. All the change did was preclude him from thwarting the execution of the existing judgment against him by reliance upon his own clearly illegal activities. He never had the right to demand an exercise of leniency in the first place, or, for that matter, to insist that society allow him to ask for it.
 
 
 82
 As the Fourth Circuit put it, "[l]ike a prisoner waiting for the executive pardon, [he] could hope for reprieve from deportation, yet hope does not establish a right to relief." Appiah v. INS, 202 F.3d 704, 709 (4th Cir. 2000). We have agreed that a desire to obtain a suspension of deportation is simply not a right at all. Certainly, a person who has been convicted under a criminal statute cannot claim some sort of reliance upon the existing law that will preclude a later denial of "eligibility for discretionary relief." Magana-Pizano v. INS, 200 F.3d 603, 612 (9th Cir. 1999); see also Samaniego-Meraz v. INS, 53 F.3d 254, 256 (9th Cir. 1995). In my opinion, that same reasoning applies here -- a person who illegally reenters this country cannot claim reliance on that bad act in order to assert eligibility for discretionary relief.
 
 
 83
 It is important to note that the situation here is quite unlike those where a person takes some legally proper action which can be said to confer a settled expectation upon him that he will at least garner consideration for some form of discretionary relief. See, e.g., Bowen v. Hood, 202 F.3d 1211, 1220-22 (9th Cir. 2000) (if a person has already obtained eligibility for consideration for early prison release through the legal act of becoming involved in drug rehabilitation, that cannot be taken from him); id. at 1223-25 (Fernandez, J., concurring and dissenting) (same, but disagreeing on whether the threshold condition had been met); Magana-Pizano, 200 F.3d at 613 (when a person performed the legal act of pleading nolo contendere or guilty, he might have obtained a settled expectation to consideration for relief). Nothing of the sort exists here. To say that society must recognize some kind of reliance right because a person might have committed the crime of re-entry and ignored the order of deportation in the hope that he could get a later reprieve is as bizarre as saying that a person might have committed a burglary with the hope of a reprieve in mind. The claimed settled expectation here is bottomed on nothing more than an illegal act, which continued to be illegal throughout the alien's stay in this country. We might rightly ask how a person can demand a right (even one to consideration for discretionary relief) founded on nothing but his own wrongdoing. I would hold that he cannot.
 
 
 84
 Especially is all of that true once we recognize that while the prior solemn removal determination might have occurred in the past, it was not like a bursting balloon. Rather, its effect is a continuing event, just as the alien's illegal entry and presence is a continuing event. Both are still fresh and in progress, and, as a matter of functional common sense, it is their present and future effect that is in play when we execute the prior order.
 
 
 85
 In fine, the statute does not deal with any vested rights or settled expectations arising out of the alien's wrongdoing. Nor does it impose any new duties or new liabilities: It simply contains Congress's determination that the kindness of the past has been counterproductive, if we are to take immigration policies seriously, and, therefore, removes the possibility of administrative conferral of leniency. That is not retroactive at all, and if we were to call it retroactive, Congress's intent that the illegally present but persistent peregrine be removed from this country could not be more clear.
 
 
 86
 I recognize that to ultimately decide these cases, I would have to go on to determine whether the INS has properly adopted its rather harsh -- even peculiar -- notion of what process is due for the purpose of establishing the facts that allow execution on the prior order. It seems that the INS's answer to this concern is that the alien is really entitled to no process at all before a determination to execute the order is made, although a kind of motion to reconsider is provided after the INS has unilaterally made its decision. See 8 C.F.R. 241.8(b). But the decision itself is made without allowing the alien to say anything, without an examination of the alien, and without any other process. I would also have to decide whether, based upon the record such as it is,[7] the facts support the INS's determination. Castro, for example, argues that they do not. However, a lengthy analysis of those issues seems unnecessary to and inappropriate in this dissent. They are not decided by the majority, and addressing them here would come to nothing in light of its determination that the statute does not apply at all. Thus, I will not regale or bore the reader with further thoughts on those subjects.[8]
 
 
 87
 All of that being said, who can overlook the fact that most of those who illegally re-enter do not come here to commit still further wrongs? They, rather, are attracted to a country which, with its normal human faults, is one of the best places in the world to be,[9] and are often further attracted by close family ties as well. Still, they have no right -- vested, settled, or otherwise -- to amend our Constitution and laws in order to make passage between states of the world essentially the same as passage between states of the Union.
 
 
 88
 Thus, I respectfully dissent.
 
 
 
 NOTES:
 
 
 [1]
 Araujo, the next day; Rueda, a few days later; Funes, the next month; Salinas, four months later; Castro, within months. Castro does argue that his re-entry was not illegal, and that he was not literally deported.
 
 
 [2]
 The phrase "under this chapter" in the indented material is rendered "under this Act" in the statute. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 305, 110 Stat. 3009-546, 3009-599 (1996) (adding 241(a)(5) to the Immigration and Nationality Act.
 
 
 [3]
 Removal includes deportation and exclusion. See IIRIRA 309(d)(2); Prado Hernandez v. Reno, 86 F. Supp. 2d 1037, 1040 (W.D. Wash. 1999); Mendez-Tapia v. Sonchik, 998 F. Supp. 1105, 1108-09 (D. Ariz. 1998).
 
 
 [4]
 See Lon Fuller, The Morality of Law 39, 44 (1964).
 
 
 [5]
 See Oliver W. Holmes, The Path of The Law, 110 Harv. L. Rev. 991, 992 (1997).
 
 
 [6]
 See, e.g., 8 U.S.C. 1229a(a)(1), 1229(b), 1255. Asylum and withholding are still available. See 8 C.F.R. 241.8(d).
 
 
 [7]
 We are limited to the administrative record. See Fisher v. INS, 79 F.3d 955, 963-64 (9th Cir. 1996) (en banc).
 
 
 [8]
 Perhaps needless to say, I do not join the majority's musings on the subject in part III of its opinion, which, like mine, are nothing but dicta. As to its doubts about the use of immigration officers rather than IJ's, however, see United States v. Garcia-Martinez, 228 F.3d 956, 960-63 (9th Cir. 2000).
 
 
 [9]
 In my personal view, it is the very best place to be, but for purposes of an opinion one should avoid hyperbole.